1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10
11

| | |
|---|---|
| WILLIAM TAYLOR SCOTT, | CASE NO. 10cv1167 BEN (PCL) |
| Plaintiff, | REPORT AND RECOMMENDATION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| MICHAEL J. ASTRUE, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | |
| Defendants. | |

12
13
14
15
16
17
18

## I.      INTRODUCTION

19        On May 28, 2010, Plaintiff filed this action pursuant to sections 405(g)  and 1383© of the

20  Social Security Act ("Act"), seeking judicial review of a final decision of the Commissioner of Social

21  Security ("Commissioner") denying his application for Supplemental Security Income Payments

22  ("SSI") under Title XVI of the Act and Disability Insurance Payments ("DIB") under Title II of the

23  Act.  [Doc. 1.]  The Honorable Roger T. Benitez referred the matter to this Court for Report and

24  Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Plaintiff filed a Motion for Summary

25  Judgment, [doc. 19], and Defendant filed a Cross-Motion for Summary Judgment, [doc. 20].

26  Defendant has also filed an Opposition to Plaintiff's Motion for Summary Judgment.  [Doc. 21.]  For

27  the reasons set forth below, this Court recommends Plaintiff's Motion for Reversal and/or Remand

28  be Denied and Defendant's Cross Motion for Summary Judgment be Granted.

## II.   PROCEDURAL HISTORY

On June 21, 2007, Plaintiff filed applications for disability insurance benefits and supplemental security income under titles II and XVI of the Act, alleging disability since February 1, 2007. [A.R. 16-5, at 2.]  The claims were denied initially on September 25, 2007, and upon reconsideration on February 15, 2008[1]. [A.R. 16.]  On August 5, 2009, Administrative Law Judge ("ALJ"), Peter J. Valentino, presided over a hearing of the case in San Diego, California. [A.R. 15.]  Plaintiff was present and represented by attorney David M. Shore. [A.R. 15.] Vocational expert, Nelly Katsell, and medical expert, Robert McDevitt also testified. [A.R. 15.]  In a decision dated August 19, 2009, the ALJ denied Plaintiff's request for benefits.

After considering the evidence, Judge Valentino concluded the following:

(1) Plaintiff met the insured status requirements of the Act through December 31, 2007;

(2) Plaintiff had not engaged in any substantial gainful activity since February 1, 2007;

(3) Plaintiff had the severe impairments of bipolar disorder, alcohol abuse disorder, and skin cancer;

(4) Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525, 404.1526, 416.925, and 416.926);

(5) Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that he needed to avoid working outdoors and was mentally limited to simple and repetitive tasks with no public contact;

(6) Plaintiff was unable to perform any of his past relevant work;

(7) As of the alleged disability onset date, Plaintiff was born on May 23, 1957 and was 49 years old, which is defined as a younger individual, and subsequently changed age category to closely approaching advanced age;

(8) Plaintiff has at least a high school education and is able to communicate in English;

(9) Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not

---

[1] The administrative record reads, "these claims were denied initially on September 25, 2008, and upon reconsideration on February 15, 2008."

disabled, whether or not he has transferable job skills;

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform;

(11) The claimant had not been under a disability, as defined in the Social Security Act, from February 1, 2007 through the date of the decision.

[A.R. 18-23.]

On March 25, 2010, the Appeals Council denied review, making the decision of the ALJ the final decision of the Commissioner of the Social Security Administration.  [A.R. 2.]

**III.    ADMINISTRATIVE RECORD**

Plaintiff was born on May 23, 1957, and was 49 years old on the alleged disability date.  [A.R. 14.] He alleged disability due to sciatica, fatigue, paranoia, depression, and mood swings.  [A.R. 14.]

**A.    Medical Evidence**

1.    Treating Physicians

On December 4, 2006, Plaintiff was seen by Jorge Galdamez, M.D. at the Vista Community Clinic.  [A.R. 234-35.]  The treatment notes are mostly illegible, but it appears that Plaintiff sought treatment for his skin cancer and was given a referral to a dermatologist.  [A.R. 234-35.]  The next record of Plaintiff's treatment for skin cancer is a tissue biopsy report from UC San Diego/UCSD Medical Center dated August 8, 2007.  [A.R. 259-62.] The clinical history note indicates Plaintiff had previously been diagnosed with basal cell carcinoma in 1992 and that lesions had recurred on his chest and left shoulder.  [A.R. 259-62.]  Based on the biopsy, Plaintiff was again diagnosed with basal cell carcinoma with infiltrative pattern.  [A.R. 259-62.]  Plaintiff was referred for surgery, but not seen because he lacked insurance.  [A.R. 377.]

On April 10, 2007, Plaintiff was taken to Tri-City Medical Center by Carlsbad police for threatening people with a knife, arguing with a neighbor, and drinking.  [A.R. 248-58.]  Plaintiff was treated with Geodon, Ativan and Haldol[2] while awaiting psychiatric evaluation.  [A.R. 254.]  The

---

[2] Geodon is used to treat episodes of mania in patients with bipolar disorder. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001070/.  Ativan is used to treat anxiety and to reduce agitation caused by alcohol withdrawal.

1  notes indicate that Plaintiff had a high level of ethanol in his blood, admitted drinking heavily for

2  several days prior to his visit, and that he "drinks to excess frequently." [A.R. 16-7, at 253-56.] The

3  notes also indicate that Plaintiff had not been taking any medications for a long period of time. [A.R.

4  253.]  The working diagnoses were alcohol intoxication and psychosis. [A.R. 255.]  A note titled

5  "Impression" indicates "exacerbation of bipolar disorder" and "intoxication." [A.R. 255.]  Plaintiff

6  was discharged with instructions not to drink or brandish a knife. [A.R. 253.]

7       On July 5, 2007, Plaintiff was again taken to the Emergency Department of Tri-City Medical

8  Center by Carlsbad Police for intoxication and suicidal threats. [A.R. 239-47.] The treatment record

9  indicates that Plaintiff was alert and oriented, but verbally abusive, crying and melodramatic. [A.R.

10 240.]  Plaintiff was sad because his girlfriend had recently broken up with him and he was

11 unemployed. [A.R. 240.] Plaintiff had a history of bipolar disorder, and denied drug use but indicated

12 regular alcohol use. [A.R. 240-41.]  Based on his history and laboratory testing, Plaintiff was

13 diagnosed with alcohol abuse. [A.R. 240.]

14      Plaintiff visited Vista Community Clinic on August 28, 2007. [A.R. 274.]  Plaintiff reported

15 receiving Librium from Tri-City Medical Center in June and July, but that he had lost it and that he

16 had a history of alcohol abuse since the age of 16; he requested fasting labs and a hepatitis test due

17 to recent high risk sexual activity. [A.R. 274.]  Blood was sent to Quest Diagnostics and the results

18 indicate "reactive" for Hepatitis B. [A.R. 278.]  However, on August 27, 2008, Plaintiff had labs

19 taken, including a hepatitis screen indicating "HEP C AB" non-reactive. [A.R. 386.]  The Vista

20 Community Clinic notes also document his skin cancer and state that he was scheduled for surgery.

21 [A.R. 274.]  Plaintiff returned the next day, on August 29, 2007. [A.R. 273.]  Notes indicate that

22 Plaintiff was "combative, drunk, crying," and complained of low back pain. [A.R. 273.] Plaintiff was

23 assessed with alcohol abuse and sciatic pain and given Librium and Naproxen.[3] [A.R. 273.] Notes

24 also indicate that Plaintiff was asked not to return due to his inebriation and combative behavior. [A.R.

25

26    http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/.   Haldol is used to treat psychotic
   disorders.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000604/.

27

28    [3] Librium is used to relieve anxiety and control agitation caused by alcohol withdrawal.
   http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000568/.  Naproxen is prescribed to relieve pain.
   http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526/

273, 320.]  Plaintiff returned to Vista Community Clinic on September 4, 2007, but the notes are illegible. [A.R. 272.]

On September 12, 2007, Plaintiff was given a psychiatric assessment by Lee Bowlus, M.D., a staff psychiatrist in the Mental Health Services division of the County of San Diego Health and Human Services Agency. [A.R. 236-38.] The record from that visit indicates that Plaintiff's chief complaint was hearing voices, paranoia, and depression. [A.R. 238.] Plaintiff's psychiatric history included outpatient treatment for years for problems associated with paranoia, auditory hallucinations, and depression. [A.R. 238.] Plaintiff had previously been on a number of medications and desired to restart some medication. [A.R. 238.] Plaintiff admitted alcoholism, but stated he had not been drinking for years,  and denied knowledge of serious medical problems or allergies. [A.R. 238.] Dr. Bowlus reported that Plaintiff was cooperative, somewhat disorganized in thought, "look[ed] a bit downtrodden" but demonstrated no slurring or pressure of speech." [A.R. 238.] Dr. Bowlus wrote that Plaintiff's mood was dysphoric, his affect appropriate, his controls adequate, and that he denied suicidal ideation. [A.R. 238.] Bowlus assessed a Global Assessment of Functioning ("GAF") score of 55 and diagnosed Psychotic Disorder, Not Otherwise Specified, and likely Schizoaffective disorder. [A.R. 238.] Finally, Bowlus developed a treatment plan whereby Plaintiff would begin taking 20mg. per day of Celexa for depressive complaints and10mg. Zyprexa for hallucination and paranoia. [A.R. 238.] Plaintiff was advised to follow up with North Coastal Clinic. [A.R. 238.]

The remainder of the administrative record is comprised of medical records from the California Department of Corrections and Rehabilitation ("CDCR"), where Plaintiff was incarcerated from August of 2008 through March of 2009 for driving under the influence[4]. [A.R. 331-390.] According to a Mental Health Placement Chrono Dated August 26, 2008, Plaintiff met the inclusion criteria for the CDCR's Mental Health Services Delivery System ("MHSDS") due to medical necessity. [A.R. 390.] He was assessed with a GAF score of 56 and psychotropic medication was prescribed. [A.R. 390.]  Plaintiff received a Mental Health Evaluation on August 28, 2008, however the record is mostly illegible and is missing all but 6 of 14 pages. [A.R. 381-84, 388-89.] Under "Mental Health

_____

[4] Plaintiff also submitted his medical and parole records for the period following his incarceration from April 1, 2009 through July 13, 2009, but these records are illegible. [A.R. 391-401.]

History," Plaintiff reported having received prior inpatient treatment for three days at "San Bernardino CMH  (thought Jesus was talking to me . . . coming off acid)" and that he was diagnosed bipolar at San Quintin.  [A.R. 381.]  This is notable, however, because throughout the remainder of the record Plaintiff denied drug abuse and tested negative for drugs when screened.  [A.R. 343.]  Plaintiff reported a history of alcohol abuse since age 12 including withdrawals and blackouts.  [A.R. 381, 383.] Plaintiff was prescribed several medications, assessed a GAF score of 65, and given provisional diagnoses of adjustment disorder (309.28), hallucinogen abuse (305.3), and deferred (799.9)[5].  [A.R. 388.]  Psychiatry Progress notes dated September 18, 2008 indicate that Plaintiff stated he felt depressed because he was in prison, but would be ok otherwise.  [A.R. 378.]  Plaintiff reported no negative side effects of his medications, but indicated that he never took his Effexor because he worried it would keep him up at night.  [A.R. 378.]  The notes indicate Plaintiff was pleasant and cooperative and well groomed; they also indicate he had normal thought rate, flow, and associations and lacked delusions or hallucinations.  [A.R. 378.]

Plaintiff had follow-up care for his psychiatric concerns with medication monitoring on October 20, 2008, and again on November 17, 2008.  [A.R. 355-56, 358.]  On the latter date, he was prescribed Effexor, Benadryl, and Trazadone.  [A.R. 355.]  Plaintiff again had his medications adjusted on December 22, 2008.  [A.R. 350.]  Plaintiff submitted a request for health care services on January 2, 2009, complaining of feeling very down, paranoid, and a bit confused.  [A.R. 342.]  He stated "[I] need a change of medication, no more Effexor . . . ."  [A.R. 341.]  He requested additional changes on January 18, 2009 and January 25, 2009.  [A.R. 338, 341.]  On January 26, 2009, Plaintiff was seen by a mental health professional and requested Prozac, calling it the "sunshine drug."  [A.R. 337.]  The notes indicate the requested change was made and also indicate that Plaintiff was not suffering from delusions, that his impulse control was good and his cognitive processes intact.  [A.R. 337.]  On February 4, 2009, Plaintiff was again seen by a psychologist who reported that Plaintiff's

---

[5] DSM IV code 799.9 may be used 1) for a specific mental disorder not included in the DSM-IV Classification, 2) when none of the available Not Otherwise Specified categories is appropriate, or 3) when it is judged that a nonpsychotic mental disorder is present but there is not enough information available to diagnose one of the categories provided in the Classification. In some cases, the diagnosis can be changed to a specific disorder after more information is obtained. http://psychiatryonline.org/content.aspx?bookid=22&sectionid=1893015

thought processes were "clear, sequential, logical" and who noted no delusions.  [A.R. 336.]

On November 8, 2008, Plaintiff was seen for his skin cancer and referred to surgery, he was also prescribed Lopid to regulate his high cholesterol and triglycerides[6] and given Tylenol with Codeine.  [A.R. 358.]  Plaintiff underwent surgery to remove his basal cell carcinomas on January 6, 2009.  [A.R. 344-48.]  At the time of his preoperative examination, his medications were Tylenol with Codeine, Gemfibrozil for cholesterol, Venlafaxine for depression, benadryl, Trazadone, and FiberCon.  [A.R. 343.]  Plaintiff received follow up visits on February 6, 2009 and February 17, 2009.  [A.R. 335.]

2.       Evaluating and Consulting Physicians

The record contains a Medical Evaluation/Case Analysis signed on August 30, 2007, by H.M. Skopec, M.D.  [A.R. 267-70.]  The report indicates that Plaintiff alleged constantly feeling fatigue feeling depressed and paranoid and experiencing itching and burning on his skin.  [A.R. 267.]  The summary states that Plaintiff stated he had not seen doctors on a regular basis for his condition because of a lack of health insurance and that he had been incarcerated for driving under the influence ("DUI") in 2004[7].  [A.R. 267.]  Plaintiff further reported that he had worked for a pool and spa company for years, but stopped working in February of 2007 because of conflicts with his boss.  [A.R. 267.]

Assessing Plaintiff's physical allegations, the report indicated lab results dated August of 2007 showed Plaintiff was hepatitis B reactive and had high lipids, but was otherwise normal.  [A.R. 269.]  The evaluator also noted Plaintiff's allegations of sciatica indicating that objective findings from medical evidence dated September 4, 2007, included back tenderness and straight leg raising position at 20 degrees, but concluded that there was no objective medical evidence to substantiate back pain or sciatica.  [A.R. 270.]  The evaluator also noted Plaintiff's skin cancer allegations and concluded that Plaintiff should observe sun precautions, but that his type of skin cancer rarely metastasize and typically is cured by surgery.  [A.R. 269.]

In evaluating Plaintiff's psychiatric allegations, the report noted certain inconsistencies

---

[6] See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000854/

[7] In addition to Plaintiff's 2008 DUI, Plaintiff had three prior convictions for DUI.  [A.R. 388.]

between Plaintiff's responses during the evaluation and those he had given when he was evaluated at San Diego County Mental Health in September of 2007.  [A.R. 270.]  Notably, when speaking to the physician performing the case analysis, Plaintiff reported that he did not have insurance and had not had outpatient treatment, except for having taken Prozac while incarcerated, but reported to San Diego County Mental Health that he had received outpatient treatment in Northern California for years. [A.R. 270.]   The evaluator noted that Plaintiff had continued to work despite his depression allegations. [A.R. 270.]  The evaluator also noted that Plaintiff's thought process was organized and goal oriented.  [A.R. 270.]  Plaintiff had followed up several times, making sure his medical records had been received and had been "overly friendly . . . apparently trying to reason [with the evaluator] that he is truly disabled."  [A.R. 270.]  During their "multiple" conversations, Plaintiff did not exhibit any signs of internal stimuli.  [A.R. 270.]  The evaluator also noted that, while Plaintiff indicated that he had not been drinking for years, he had been taken to emergency rooms twice in 2007 alone for intoxication, thus reducing Plaintiff's credibility.  [A.R. 270.]

The record contains a "Psychiatric Review Technique" form dated September 25, 2007, and signed by H.M. Skopec, M.D..  [A.R. 290-300.]  Plaintiff's Medical Disposition was determined to be a non-severe impairment consisting of affective disorders characterized as a mood disorder, which is a medically determinable impairment that does not satisfy the diagnostic criteria.  [A.R. 290-92.] Dr. Skopec opined that Plaintiff had mild functional limitations in his activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, and pace.  [A.R. 298.] Plaintiff did not have any episodes of decompensation of extended duration. [A.R. 298.]  Plaintiff did not meet the "C" criteria of the listings.  [A.R. 299.]  Dr. Skopec noted that Plaintiff was partially credible but that his psychiatric limitations did not significantly decrease his ability to function.  [A.R. 300.]  He also noted that all Plaintiff's brief decompensation episodes were related to alcohol abuse. [A.R. 300.]  On February 11, 2008, George Lockie, M.D. completed a Case Analysis confirming the previous Medical Disposition of non-severe.  [A.R. 321-22.]

### 3.   Third Party Function Reports

Plaintiff's sister, Jerri L. Scott, completed a Third Party Function report on July 9, 2007, describing Plaintiff's daily activities.  [A.R. 16-6, at 23-31.]  She described Plaintiff's daily activities,

writing that he "reads paper, makes phone calls, sends emails, cleans up apartment, rests and treats back with heating pad and ice pack (rotating), goes to store sometimes." [A.R. 175.] In response to a question asking what the disabled person was able to do prior to the illness or injury that the person is no longer able to do, Scott wrote that Plaintiff was "limited." [A.R. 175.] She stated that dressing causes Plaintiff excruciating pain when his sciatica is active, and occasionally had difficulty getting up when using the toilet, but that he was able to perform other personal care activities without issue. [A.R. 175.] She reported that Plaintiff's conditions affected his sleep by causing him to turn over, wake up in pain, and to have occasional bad dreams of dying. [A.R. 176.]

Plaintiff's alleged disability did not cause changes to his typical meal preparation consisting of sandwiches or microwavable foods. [A.R. 177.] Scott reported that Plaintiff's only household chore was doing laundry once a week, two loads, for two hours, but that he did not do other house or yard work because of his disability. [A.R. 177-78.] Next, in response to the question, "does he/she need help or encouragement doing these things? If yes, what help is needed?" were the words, "from my sister." [A.R. 177.] The report indicated that Plaintiff went outside depending on his condition and pain; that he did not drive and had too much back pain to go out alone. [A.R. 177-80.]

Scott reported that Plaintiff was not able to pay bills, handle a savings account, count change, or use a checkbook or money orders, but did not explain the answers. [A.R. 180.] She wrote that Plaintiff's ability to handle money changed since the onset of his alleged disability in that he has less money than before and cannot pay bills causing him to borrow from their mother. [A.R. 181.] Scott described Plaintiff's hobbies as reading, astrology, going to church, working on DVD players, listening to Christian music, and watching TV. [A.R. 181.] She wrote that since the onset of Plaintiff's alleged disability, Plaintiff had less motivation as a result of his severe bi-polar disorder and depression, and that Plaintiff had fears of dying from his skin cancer. [A.R. 181.] According to Scott, Plaintiff's social activities did not include spending time with others, but did include church attendance, grocery shopping, and time at the library and park. [A.R. 181.] She wrote that pain affected Plaintiff's mood and bi-polar disorder. [A.R. 182.] Scott reported that, since the onset of Plaintiff's alleged disability, Plaintiff's social activities changed in that he was less motivated to go out and to participate in social functions. [A.R. 182.]

Scott indicated that Plaintiff's illness affected his ability to lift, squat, bend, stand, reach, sit, kneel, talk, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and to get along with others. [A.R. 180-82.] She wrote that Plaintiff was able to walk one-half to one mile before needing to rest for five to ten minutes; that his attention span was very short; that he generally did not finish what he started; that he did not follow written instructions well; and that his ability to follow spoken instructions depended on whether he was able to remember the instructions or whether pain or distraction interfered. [A.R. 180-82.] She indicated that Plaintiff was unable to get along with authority figures when in pain or having mood swings and that he handled stress and changes in routine very poorly, but that Plaintiff had never been fired or laid off as a result of his problems getting along with others. [A.R. 180-82.] Scott reported that Plaintiff needed to use a cane as well as a heat and ice packs, which were prescribed for him in the 90's, on a daily basis. [A.R. 180-82.]

### 4. Plaintiff's Function Report

On June 27, 2007, Plaintiff completed a Function Report. [A.R.183-190.] His daily activities consisted of making phone calls and setting appointments, seeking financial assistance through a variety of government programs, and reflecting on his difficult situation. [A.R. 183.] Plaintiff stated that, prior to his alleged disability, he was able to work outside and stand or sit for any length of time, but was no longer able to do so. [A.R. 183.] He indicated that his disability affected his ability to dress himself "due to [his] sciatica and skin cancer," that water from the shower head caused him pain, and that he often did not eat because he either forgot or did not feel motivated to eat. [A.R. 183.] Plaintiff indicated that he did not require personal care reminders, but that, since the onset of his illness, he had "lost motivation to do dishes and get out of bed to prepare food." [A.R. 184.] He indicated that he was able to do laundry, hardly ever did so, and required verbal and physical help to complete the task. [A.R. 185.] He also indicated that he did not do yard work because the apartment manager at his complex did the work and because his skin cancer prevented him from staying out in the sun. [A.R. 186.]

In contrast to his sister's function report, Plaintiff reported that was able to drive, walk and use public transportation when going out. [A.R. 186.] He indicated that he was able to count change but unable to pay bills, use a savings account, or use checks or money orders because he had no money

to pay his bills.  [A.R. 186.]  He indicated that his ability to handle money had changed since the onset of his alleged disability because he had little or no money, which made prioritizing expenditures difficult.  [A.R. 187.]  He listed the same hobbies as in his sister's report, but indicated that these activities had changed since the onset of his alleged disability because he suffered a loss of motivation as a result of depression and ADHD as well as severe back pain.  [A.R. 187.]

Plaintiff also reported his social contact as talking on the phone or having people over to visit two to three times per week.  [A.R. 188.]  He reported regular church attendance, and grocery shopping.  [A.R. 188.]  Plaintiff indicated that he had difficulty getting along with others because disagreements would cause his bi-polar disorder "kick in severely."  [A.R. 189.]  Plaintiff also indicated that his disability affected his lifting, squatting, bending, sitting, standing, reaching, walking, kneeling, stair-climbing, memory, ability to complete tasks, concentration, understanding, ability to follow instructions and to get along with others, but did not indicate how.  [A.R. 189.]  He indicated that he had the ability to walk one-half to one mile before needing rest; that he was sometimes only able to pay attention for less than a minute because of his propensity to become distracted; and that he did not finish things he started.  [A.R. 189.]  He stated that he was able to follow written instructions "half way decent" and verbal instructions "half way decent" provided he was able to remember them.  [A.R. 189.]

Plaintiff reported that he was able to get along with authority figures "pretty decent unless [he was] having major mood swings that hour."  [A.R. 190.]  He indicated that he had never been fired as a result of problems getting along with others, but that stress caused him to become overwhelmed and to have panic attacks and emotional break-downs, during which he would throw things, cry, or both.  [A.R. 190.]  Finally, Plaintiff indicated that he used a cane, foot massager, and heating and ice packs at least daily for his back pain.  [A.R. 190.]

## B.    Administrative Hearing

On August 5, 2009, ALJ Peter J. Valentino conducted a hearing to determine Plaintiff's disability benefits claims.  [A.R. 20.]  The Plaintiff appeared in person, represented by his attorney.  [A.R. 20.]  Vocational Expert ("VE") Ms. Katsell and Medical Expert ("ME") Mr. McDevitt also testified.  [A.R. 20.]

10cv1167

1.      Plaintiff's Testimony

Plaintiff testified that he finished high school, and a little college, and that, in the last fifteen years, the most relevant work he had done was doing pool and spa service.  [A.R. 23.]  He stopped working in that job because his employer went out of business and because of his back pain and arthritis.  [A.R. 26.]  Plaintiff also testified that he had worked as a production line worker for one and a half years.  [A.R. 23.]  Plaintiff testified that since his pool service job ended in 2007, he had been seeking other work such as being a caregiver to the elderly or working at Wal-mart, but to no avail.  [A.R. 27.]  He testified that he would really like to work and was spending an average of two and a half hours per day on the internet applying for jobs, but felt that the recession was preventing him from obtaining employment.  [A.R. 28, 35.]  He also stated that he signed up for a class to become a veterinary assistant through the California Department of Rehabilitation.  [A.R. 29.]

He testified that he had been incarcerated for DUI and, at the time of the hearing, was attending Alcoholics Anonymous meetings several times per week.  [A.R. 24.]  He stated that he had been seen at the outpatient parole office for his mental health concerns and was prescribed Welbutrin as well as Trazadone but that these medications were not helping him.  [A.R. 30.]  He testified that he was required to submit to testing once a month at the parole office and that he had been clean and sober since his release from prison.  [A.R. 36.]  In response to further questioning about what symptoms he had after taking the medicines, Plaintiff stated that they were helping him to avoid cigarette smoking and consuming alcohol, but that he still felt depressed and suffered from mood-swings.  [A.R. 31.]

In response to questioning from the ME, Plaintiff indicated that he has intermittent difficulty getting along with others because he tends to have "outbursts" and that he tries to be in a good mood, but "it just doesn't seem to work."  [A.R. 39.]

2.      Medical Expert's Testimony

The ALJ questioned the ME regarding Plaintiff's medically determinable impairments, whether or not those impairments met the listings, and what Plaintiff's capacity was.  [A.R. 40.]  The ME answered with equivocation, stating, "he's apparently had a mood disorder of some sort. Basically in prison they treated him with anti-depressant medication.  He didn't do well and they put

him on Effexor which made him a little worse and a little more irritable . . . the psychiatrist . . . called him a depressive disorder NOS . . . ." [A.R. 40.]  The ME also mentioned another psychiatrist's diagnosis of "depressive disorder NOS," and another of "adjustment disorder with mixed mood, depression, and anxiety." [A.R. 40.]  The ME also discussed Plaintiff's trips to the emergency room for intoxication and called it "pathological intoxication with extreme psychotic symptoms that . . . responded to anti-depressants [and] to anti-psychotic medication . . ." [A.R. 41.]  He stated, "there is this issue of depression, however if he stays sober and takes his medication that's under control . . . there is a certain inter-personal problem that he has that interferes with his ability to work and that's this kind of almost irritable mood disorder which I think is probably there . . . inter-personal contact would be - he may not, or equal the listings at this point since he's sober and he's taking his medication." [A.R. 42.]

In response to questioning by the ALJ about the impact of Plaintiff's drinking, the ME opined that drinking brings out Plaintiff's underlying mood disorder.  [A.R. 42-43.]  Ultimately, the ME opined that Plaintiff could not work outdoors, should have limited public contact and had the capacity to maintain simple, repetitive work if he maintained his sobriety.  [A.R. 43.]  Plaintiff's attorney then questioned the ME who opined that Plaintiff would not likely have any problems with attending work regularly and who stated that there is not enough information in the record to support Plaintiff's allegations of back pain.  [A.R. 43-44.]

### 3.   Vocational Expert's Testimony

The ALJ posed the following hypothetical to the VE Ms. Katsell: "[i]f I find and accept my medical expert's opinion based upon the record that the claimant's capacity would be limited to simple repetitive tasks, limited public contact without exposure to outdoor work, outdoor environment because of his skin cancer problem; would he be able to do his past work?"  [A.R. 44.]  The VE testified that Plaintiff would be able to return to his prior general production work, DOT 529.686-070, SVP 2. [A.R.44.]  The VE also testified that Plaintiff would be able to work as an assembler, DOT 706.684-022; or as a garment folder 789.687-066.  [A.R. 45.]

In response to questioning by Plaintiff's attorney, the VE testified that the exertional level for general production work is medium and that if restrictions of either light or sedentary work were

added to the hypothetical, then no past relevant work would be available.  [A.R. 46.]  The VE also

testified that if Plaintiff were limited to sedentary work, he would "grid out" when he turns 52,

meaning that he would be disabled under the medical vocational guidelines.  [A.R. 46-47.]  Plaintiff's

attorney referred to the ALJ's hypothetical and asked whether general production work would be

sustainable if the person were off task twenty percent of the time due to psychologically based

symptoms.  [A.R. 47.]  In response, the VE also testified that it would not.  [A.R. 47.]

## IV.    ALJ DECISION

The ALJ sought to determine whether Plaintiff was disabled under sections 216(I), 223(d) and

1614(a)(3)(A) of the Social Security Act. [A.R. 11.]  After finding that Plaintiff met the insured status

requirements of sections 216(I) and 223, the ALJ ruled that Plaintiff was not disabled as defined by

the Act from February 1, 2007 through the date of his decision. [A.R. 11.]

The ALJ determined that the Plaintiff had the severe impairments of bipolar disorder, alcohol

abuse disorder, and skin cancer, but that the evidence did not support Plaintiff's claims of back pain

and sciatica because the exams did not show any abnormal clinical findings concerning his lumber

spine and no back disorder had been diagnosed.  [A.R. 13-14.]  The ALJ determined that Plaintiff's

impairments, alone or in combination, did not meet or medically equal one of the listed impairments

in 20 C.F.R. Part 404; Subpart P, Appendix 1.  [A.R. 14.]  The ALJ summarized the Psychiatric

Review Technique, noting that Plaintiff had mild restrictions in activities of daily living; mild

difficulties in maintaining social functioning; moderate difficulties in maintaining concentration,

persistence, and pace; and had one episode of decompensation of extended duration.  [A.R. 14.]  The

ALJ noted that the "C" Criteria of the listings were not met because Plaintiff did not have repeated

episodes of decompensation, or marginal adjustment such that a minimal increase in mental demands

or change in environment would cause decompensation, or a history of one or more years of inability

to function outside of a highly supportive living arrangement.  [A.R. 14.]

Plaintiff was left with the Residual Functional Capacity to perform light work as defined in

20 C.F.R. §§ 404.1567(b) and 416.967(b), except that would be required to avoid working outdoors

and was mentally limited to simple and repetitive tasks with no public contact.  [A.R. 14.]  The ALJ

found that Plaintiff's medically determinable impairments could reasonably be expected to cause his

alleged symptoms but that Plaintiff's statements concerning the intensity, persistence, and limiting

effects of those symptoms were not credible to the extent they were inconsistent with the Residual

Functional Capacity assessment.  [A.R. 15.]  The ALJ gave the following reasons for making this

determination:

> The claimant has not been compliant with his treatment regimen.  Indeed, his noncompliance has led to emergency room treatment for exacerbation of his depression (Exhibit 4F/6). When the claimant is compliant, progress notes reflect that his mood and symptoms have stabilized (e.g. Exhibit 16F/7).
>
> The claimant's allegations of disability are inconsistent with the fact that he has been actively applying for work since he was released from jail on March 17, 2009. Indeed, he has been spending about 3 hours per day on the computer making job applications. Further, he is scheduled to begin a class for veterinary assistance. The weight of the objective evidence does not support the claims of the claimant's disabling limitations to the degree alleged. Other than skin cancer blotches and lesions, physical exams have been unremarkable (e.g. Exhibits 4F/7'; 8F/3; 16F/3, 6-7, 9, 14, 22, 32-33). Exams have not shown any psetechia or rash. From a mental standpoint, mental status exams are notable for some disorganization of thought (e.g. Exhibits 2F/2; 10F/3; 16F/48). However, he has not slurred or shown pressure of speech.
>
> The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. The claimant's course of treatment since his alleged disability onset date has generally reflected a conservative approach. The record does not show that the claimant requires any special accommodations (e.g., special breaks or positions) to relieve his pain or other symptoms. In contrast to the allegations of the claimant's disabling fatigue and weakness, he does not exhibit any significant atrophy, loss of strength, or difficulty moving that are indicative of severe and disabling pain. Although the claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in his favor, the objective medical evidence shows that the medications have been relatively effective in controlling the claimant's symptoms. Moreover, the claimant has not alleged any side effects from the use of medications. There is no evidence of loss of weight due to loss of appetite due to pain or depression. There is no evidence of sleep deprivation due to pain or depression.
>
> The claimant's allegations of significant limitations are not borne out in his/her description of her daily activities. Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.
>
> In choosing not to appear at the scheduled consultative examination, the claimant gave up the opportunity to provide convincing evidence about the allegedly disabling symptoms and limitations.

> None of the claimant's physicians have opined that she [sic] is totally and permanently disabled from any kind of work.

[A.R. 15-16.]

The ALJ also discussed the weight he afforded to the opinion evidence, stating that he gave significant weight to the opinion of the medical expert who had the opportunity to review all of the evidence of record. [A.R. 16.] The ALJ noted that the ME's opinion fairly took into consideration all of the symptoms and limits that reasonably flow from the established severe impairments. [A.R. 16.]

The ALJ found that Plaintiff was unable to perform any of his past relevant work either as a pool technician or a production line worker; that on the alleged disability onset date, Plaintiff was 49 years old, which is defined as a younger individual, but that Plaintiff subsequently changed age categories to closely approaching advanced age. [A.R. 16.] The ALJ found that Plaintiff had at least a high school education and is able to communicate in English. [A.R. 17.] Transferability of job skills was not material to the determination because the Medical-Vocational Rules support a finding of "not disabled" whether or not Plaintiff had transferable job skills. [A.R. 17.] The ALJ next found that, considering the Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. [A.R. 17.]

The ALJ considered Plaintiff's functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 ("grids"). [A.R. 17.] Because Plaintiff's ability to perform all or substantially all of the requirements of light work was impeded by additional limitations, the ALJ used the grids as a framework for making a disability determination. [A.R. 17.] To determine the extent to which Plaintiff's limitations eroded the unskilled light occupational base, he asked the VE whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and residual functional capacity. [A.R. 17.] The VE testified that such an individual would be able to perform the requirements of representative occupations such as small products assembler and garment folder. [A.R. 17.] The ALJ confirmed that, pursuant to SSR 00-4p, the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles ("DOT"). [A.R. 17.] Based on the VE's testimony, the ALJ concluded that Plaintiff is capable of making a successful adjustment to other

1   work that exists in the national economy, and therefore, is not disabled.  [A.R. 17.]

2   **V.       DISCUSSION**

3   **A.       Standard of Review**

4   To qualify for disability benefits under the Act, an applicant must show that: (1) she suffers

5   from a medically determinable impairment that can be expected to result in death or that has lasted

6   or can be expected to last for a continuous period of twelve months or more, and (2) the impairment

7   renders the applicant incapable of performing the work that she previously performed or any other

8   substantially gainful employment that exists in the national economy.  42 U.S.C.A. § 423(d)(1)(A),

9   (2)(A).

10                  1.       Sequential Evaluation of Impairments

11  The Social Security Regulations outline a five-step process to determine whether an applicant

12  is "disabled."  The five steps are as follows: (1) Whether the claimant is presently engaging in any

13  substantial gainful activity.  If so, the claimant is not disabled.  If not, the evaluation proceeds to step

14  two. (2) Whether the claimant's impairment is severe.  If not, the claimant is not disabled.  If so, the

15  evaluation proceeds to step three.  (3) Whether the impairment meets or equals a specific impairment

16  listed in the Listing of Impairments ("listings").  If so, the claimant is disabled.  If not, the evaluation

17  proceeds to step four.  (4) Whether the claimant is able to do any work she has done in the past.  If so,

18  the claimant is not disabled.  If not, the evaluation proceeds to step five.  (5) Whether the claimant is

19  able to do any other work.  If not, the claimant is disabled.  If so, the claimant is not disabled.  20

20  C.F.R. § 404.1520 & 404. 1509; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

21  The claimant bears the initial burden of proving disability in steps one through four of the analysis.

22  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing Swenson v. Sullivan, 876 F.2d 683, 687

23  (9th Cir. 1989).)  If a claimant establishes an inability to carry on past work, the burden shifts to the

24  Commissioner in step five to show that the claimant can perform other substantial gainful work.  Id.

25                  2.       Judicial Review

26  A claimant may seek judicial review of an unfavorable decision of the Commissioner.  The

27  district court will not disturb the Commissioner's decision unless it is based on legal error or not

28

supported by substantial evidence. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996). Substantial evidence means more than a scintilla, but less than a preponderance. Id. (citing Richardson v. Perales, 402 U.S. 389, 401 (1971); Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).) Substantial evidence is evidence that a reasonable mind would consider adequate to support a conclusion. Id. The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence is subject to more than one rational interpretation, the ALJ's conclusion must be upheld. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). But the Commissioner's decision "cannot be affirmed simply by isolating a specific quantum of supporting evidence." Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998). Rather, a court must "consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993).

The district court may enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The court may also remand the matter to the Social Security Administration for further proceedings. Id.

## VI.   DISCUSSION

### A.   The ALJ Provided Sufficient Reasons to Support his Credibility Finding

Plaintiff contends that the ALJ's reasons for disregarding Plaintiff's allegations of disability due to sciatica, fatigue, paranoia, depression, and mood swings are insufficient. [Doc. 19, at 10.] In deciding whether to accept a claimant's subjective symptom testimony, an ALJ must engage in a two step analysis. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996). The ALJ must first perform what is often referred to as the Cotton analysis; a threshold test which requires the claimant to: (1) produce objective medical evidence of an impairment or impairments that (2) can reasonably be expected to produce some degree of the symptom alleged. Id. at 1281-82 (citing Cotton v. Bowen, 799 F.2d 1403, 1407-08 (9th Cir. 1986).). The claimant need not produce evidence of the pain or fatigue itself, nor of the causal relationship between the medically determinable impairment and the symptom. Id. The Cotton test only requires that the "causal relationship be a reasonable inference,

not a medically proven phenomenon." Id. (citing Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986).)

If a claimant produces evidence of a medically determinable impairment that could reasonably produce the symptoms alleged, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of the symptoms only by offering clear and convincing reasons supported by specific findings. Id. (citing Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).) For example, an ALJ properly rejected a claimant's subjective pain testimony by noting that the claimant was capable of caring for all his personal needs, the performance of routine household maintenance and shopping chores, riding public transportation and driving. Dodrill, 12 F.3d at 918 (citing Fair v. Bowen, 885 F.2d at 604). In evaluating a claimant's credibility, the ALJ must consider the claimant's work record, observations of treating and examining physicians, and third parties regarding the nature, onset, duration, and frequency of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and adverse side effects of any pain medications; and the claimant's daily activities. Id., at 1284.

Plaintiff did not produce evidence showing that he had a medically determinable impairment that could reasonably cause his alleged back pain. One instance in the record reflected a straight leg raising test of 20 degrees, but there was no evidence of any abnormality. [A.R. 269.] The ME testified that there was no evidence to support any back injury. [A.R. 43-44.] In addition, evaluating physician Dr. Skopec discussed medical evidence dated September 4, 2007, which this Court found illegible, and wrote that it did not substantiate Plaintiff's allegations of back pain. [A.R. 270.] Therefore, despite his back pain and sciatica allegations, Plaintiff did not establish a medical impairment to support such allegations. Thus, the ALJ properly rejected subjective complaints of back pain and sciatica. Similarly, Plaintiff argues that he presented medical evidence of Hepatitis, which serves as a basis for his allegations of disabling fatigue. The record reflects one positive Hepatitis screening and a later negative screening. No doctor rendered any opinion regarding Plaintiff's Hepatitis or lack thereof. There is insufficient evidence in the record to establish that Plaintiff indeed has Hepatitis. Even assuming Plaintiff does have Hepatitis, his daily activities and failure to follow

prescribed medical treatment are sufficient bases for rejecting Plaintiff's excess pain and limitation allegations.

Plaintiff also contends that the ALJ's reasons for rejecting his other subjective pain and limitation testimony are insufficient.  First, the ALJ stated that Plaintiff was not compliant with his treatment regimen and, when compliant, his symptoms stabilized.  Plaintiff argues that this reason is not clear and convincing because Plaintiff was compliant with medications, but that his symptoms worsened requiring changes in medications and dosages.  [Doc. 19-1, at 8.]  At his hearing, Plaintiff testified that his medication was "not really" helping his mood swings or depression, but went on to state that the medication was helping him to avoid drinking, which the ME testified worsened Plaintiff's mood disorder.  [A.R. 30-31.]

This Court has reviewed the portions of the record cited by Plaintiff in support of his contention that he has been compliant with medications, but finds sufficient evidence of unexplained non-compliance to support the ALJ's conclusion.  Despite his long history of bipolar disorder, Plaintiff indicated on April 10, 2007 that he had not been taking any medications for a long period of time.  [A.R. 253.]  On August 28, 2007, Plaintiff reported to the Vista Community Clinic that he had received Librium from the Tri City medical center but had "lost it."  [A.R. 274.]  He provided no explanation as to why he did not seek to replace the medication.  Plaintiff received a psychiatric assessment on September 12, 2007, in which he complained of paranoia and hallucinations and expressed a desire to restart some medication, thus leading to the inference that he had not been taking medication.  [A.R. 237.]  According to notes taken during Plaintiff's period of incarceration, on September 18, 2008, Plaintiff reported that he had not taken his prescribed Effexor because he worried it might keep him  up at night but indicated that he had no side effects from other medications.  [A.R. 378.]  While side effects may be a reason not to take medication, Plaintiff did not indicate that he experienced side effects, but only that he feared side effects.  See Smolen, 80 F.3d, at 1284.

Plaintiff contends that the ALJ's "citation to one piece of evidence that Plaintiff's mental symptoms were stable" is not a clear and convincing reason to find Plaintiff not credible.  [Doc. 19-1, at 8.]  The weight of the evidence, however, supports the ALJ's conclusion that Plaintiff's mental

1   symptoms stabilized when he was compliant with medications.  Notes taken by the prison psychiatrist

2   on January 26, 2009, indicate Plaintiff requested Prozac, calling it the "sunshine drug," presumably

3   because it was effective in controlling his depression.  [A.R. 337.]  Moreover, the psychiatrist's notes

4   from that same date indicate that Plaintiff's impulse control was good and his thought processes intact.

5   [A.R. 337.]  Similarly, notes from other dates while Plaintiff was compliant indicate that he did not

6   suffer hallucinations or delusions, that his thought processes were orderly, and that, other than feeling

7   depressed about being incarcerated, he felt "ok."  [A.R. 336-37.]  Thus, it appears that even with

8   adjustments to medications, Plaintiff's symptoms abated with regular use of medication.  On February

9   4, 2009, psychologist's notes indicate Plaintiff's thought processes were "clear, sequential, logical"

10   and free from delusions.  [A.R. 336.]  Conversely, where progress notes document Plaintiff's

11   complaints of paranoia and hallucinations, they also indicate that he was not using his medications.

12   [A.R. 238, 273-74.] Finally, Plaintiff was not taking medications when he was taken to the emergency

13   department of Tri City Medical Center for intoxication with psychotic symptoms and he testified at

14   his hearing that the medications help him to avoid consuming alcohol.  [A.R. 31, 239-58.]  In addition,

15   Plaintiff provided no explanation for his failure to comply with treatment.  The record, therefore,

16   provides ample support for the ALJ's clear and convincing reason of noncompliance with medication

17   to reject Plaintiff's subjective limitation testimony.  See Fair v. Bowen, 855 F.2d 597, 603 (9th Cir.

18   1989) (A claimant's inadequately explained failure to seek treatment or follow a prescribed course of

19   treatment is a proper basis for an ALJ to find the claimant not credible.)

20       Plaintiff also argues that the ALJ improperly cited Plaintiff's job search as a reason for

21   rejecting his subjective pain and limitation allegations; and that the "ALJ's observations of Plaintiff's

22   daily activities did not necessarily support a finding that he is not disabled."  [Doc. 16-1, at 9,11.]

23   Plaintiff cites out of Circuit authority requiring the ALJ to "build an accurate and logical bridge from

24   the evidence to [his] conclusion."  [Doc. 19-1, at 9 (citing Steele v Barnhart, 290 F.3d 936, 941 (7th

25   Cir. 2002) (Remanded for the failure of ALJ to discuss why she characterized medical evidence which

26   clearly showed brain abnormalities as "unremarkable.").]

27       An ALJ may consider testimony regarding a claimant's daily activities when making a

28

credibility determination.  <u>Fair v. Bowen</u>, 885 F2d 597, 603 (9th Cir. 1989).  And, where evidence regarding a claimant's disability is susceptible to more than one rational interpretation, the conclusion of the ALJ must be upheld.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039-40 (9th Cir. 1995).  If a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it is reasonable for an ALJ to conclude that the claimant's pain does not preclude the claimant from working.  <u>Id.</u>  It is also true that a claimant need not be utterly incapacitated to be eligible for benefits and that many home activities are not easily transferable to the more grueling environment of the workplace.  <u>Id.</u>  Nonetheless, if a claimant is able to spend a substantial part of his or her day engaged in performance of activities that are transferable, then a specific finding as to this fact may be sufficient to discredit a subjective pain allegation.  <u>See</u>  <u>Id.</u>  Plaintiff described his daily activities as making phone calls and setting appointments and seeking financial assistance through a variety of government programs.  [A.R. 183-90.]  He indicated that he can walk one-half to one mile before needing rest; he can drive a car; and can use public transportation.  [A.R. 183-84.]  He testified that he had been seeking other work as a caregiver to the elderly or working at Wal-mart and spent an average of two and one-half hours per day working on job applications.  [A.R. 28, 35.]  He also testified that he was scheduled to begin a class for veterinary assistance.  [A.R. 29.]  Plaintiff and his sister both indicated that Plaintiff maintains hobbies, including working on DVD players.

The ALJ supplied a clearly articulated list of reasons for rejecting Plaintiff's subjective allegations stating, "[t]he claimant's allegations of disability are inconsistent with the fact that he has been actively applying for work since he was released from jail . . . indeed he has been spending about 3 hours per day on the computer making job applications . . . [and] is scheduled to begin a class for veterinary assistance."  [A.R. 15.]  "The claimant's allegations of significant limitations are not borne out in his/her description of her [sic] daily activities . . . [they] cannot be objectively verified . . . [and] it is difficult to attribute [such a] degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence. . ."  [A.R. 15-16.]  Though Plaintiff characterizes the ALJ's determination that Plaintiff's excess pain and limitation allegations were not

borne out in his descriptions of his daily activities as "punishing" Plaintiff for his efforts to work, this Court finds the ALJ supplied a clear and convincing reason, supported by substantial evidence. While Plaintiff is to be commended for his desire to work, his activities support the ALJ's finding that any allegations of limitations beyond Plaintiff's RFC are not credible. Furthermore, while it might have been just as possible for the ALJ to determine the opposite, this Court is not permitted to disturb the credibility determination of the ALJ simply because the evidence is subject to more than one rational interpretation.

Plaintiff also argues that the ALJ improperly discounted Plaintiff's credibility based on his skin cancer limitations because he was not alleging disability based on skin cancer. [Doc. 19-1, at 9.] This argument is simply nonsensical. It is clear from the record that Plaintiff not only alleged disability based on skin cancer; but it is also clear that the ALJ determined skin cancer was among Plaintiff's severe impairments because he partially based Plaintiff's RFC on his skin cancer related limitation of no outdoor work. [A.R. 13, 16.]

Plaintiff's focuses next on his mental symptoms. Plaintiff claims that the ALJ arbitrarily focused on Plaintiff's ability to speak while disregarding his "failure to organize thoughts" and that the ALJ made an unsupportable statement that Plaintiff did not suffer from cognitive defects. [Doc. 19-1, at 9-10.] The ALJ must view all of the evidence in the record - that which weighs in favor of the claimant as well as against. SSR 96-7R; Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The ALJ's determination must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. Id. And, "unless a treating source's opinion is given controlling weight, the ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist." 20 C.F.R. § 416.927(f)(2)(ii).

The ALJ noted that Plaintiff's mental status exams are notable for some disorganization of thought, but that Plaintiff had not slurred or shown pressure of speech. [A.R. 15.] Indeed, the ALJ accurately summarized the record of Plaintiff's medical exams. [A.R. 238, 270, 288, 336-37, 378.] In addition, he stated the there was no evidence of sleep deprivation due to pain or depression and no

evidence of cognitive deficits due to pain or depression.  [A.R.  16.]  The ALJ noted that none of Plaintiff's physicians opined the Plaintiff is totally and permanently disabled. [A.R. 16.]  In addition, the ALJ stated that he gave significant weight to the opinion of the medical expert, "who had opportunity to review all of the evidence in the record . . . and fairly takes into consideration all of the symptoms and limits that reasonably flow from the established severe impairments." [A.R. 16.] The ME testified that Plaintiff retained the capacity to perform simple, repetitive work if he maintained his sobriety.  [A.R. 42-44.]  Hence the ALJ provided a specific reason, supported by significant evidence in the record - the fact that Plaintiff's mental exams were notable for some disorganization of thought, but did not indicate slurring or pressure of speech.

The ALJ stated that Plaintiff had not generally received the type of treatment one would expect for a totally disabled individual and that the Plaintiff's course of treatment since his alleged disability onset date had generally reflected a conservative approach. [A.R. 15.] Plaintiff argues that this is an invalid basis for rejecting his subjective complaints because the ALJ failed to define conservative treatment or to specify what type of medical treatment was appropriate.  [Doc. 19-1, at 10.] "[E]vidence of "conservative treatment" is sufficient to discount a claimant's testimony regarding severity of an impairment." Parra v. Astrue, 481 F.3d 742 (9th Cir. 2007) (citing Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir.1995).) The record indicates that Plaintiff received intermittent outpatient treatment for his mental complaints and was hospitalized only for alcohol related episodes, and that his symptoms were controllable with medication when he was compliant.  Plaintiff has not cited any authority requiring the ALJ to also specify what would be appropriate treatment.  Therefore, we do not find error with this reason.

Plaintiff's additional arguments regarding the ALJ's rejection of Plaintiff's subjective limitation testimony are as follows.  Plaintiff argues that it was improper for the ALJ's to find that Plaintiff was not credible because he did not require special accommodations to relieve symptoms. [Doc. 19-1, at 10; A.R. 15.]  Plaintiff also claims it was improper for the ALJ to base his credibility determination in part on the fact that Plaintiff did not exhibit any significant atrophy, loss of strength, or difficulty moving, which are indicative of severe and disabling pain.  [Doc. 19-1, at 1; A.R. 15.]

Finally, Plaintiff argues that the ALJ erred by not considering Plaintiff's back pain or fatigue in his RFC determination; and that the VE's opinion is of no evidentiary value because these limitations were not part of the hypothetical posed to her by the ALJ. [Doc. 19-1, at 12-13.]  These arguments are simply meritless, as all are proper bases for a credibility determination.  Dodrill, 12 F.3d at 918 (citing Fair v. Bowen, 885 F.2d at 604).  As such, they need not be included in the hypothetical posed to the VE.  See Baugus v. Secretary of Health and Human Svcs., 717 F.2d 443, 447 n.5 (9th. Cir. 1983) (A hypothetical must include the physical and mental impairments that are accepted as true by the ALJ.)  Finally, Plaintiff failed to take part in a consultative examination.  [A.R. 16.]

B.    Third Party Statements

Plaintiff contends that the ALJ erred by not considering third party statements made by Plaintiff's relatives and friends.  [Doc. 19-1, at 15.]  Plaintiff states that "Social Security Ruling 06-03p and 20 CFR 404.1513 (d) [sic] require the ALJ to evaluate the statements made by Plaintiff's sister." [Doc. 19-1, at 16.]  Social Security Ruling 06-03p does not exist, and § 404.1513(d)(4) provides that, in addition to evidence from acceptable medical sources listed in 20 C.F.R. § 405.1513(a), the agency "may consider evidence from other sources," including relatives and friends. 20 C.F.R. § 404.1513(d)(4) (emphasis added).  Plaintiff cites Dodrill, for the proposition that "it is well established in the Ninth Circuit that 'Disregard of the testimony of friends and family members violates'" Social Security regulations.  [Doc. 19-1, at 17.]  Plaintiff has not pointed to any authority indicating that function reports are equivalent to testimony.  However, even if that is the case, Dodrill is distinguishable because the ALJ in that case dismissed all lay testimony solely because he found the claimant not credible.  Dodrill, 12 F3d at 918-19.  The ALJ here thoroughly discussed Plaintiff's subjective pain and limitation allegations, taking into account his daily activities as described by Plaintiff and his sister.  As Defendant points out, any error in disregarding the sister's statements would be harmless as they were duplicative of Plaintiff's discredited allegations.  [Doc. 21, at 7.]

C.    The ALJ Properly Addressed Plaintiff's Alcoholism

Plaintiff argues that the ALJ erred by failing to follow the Administration's procedure for cases involving drug and alcohol additions because he did not conduct a "differentiating analysis" to

separate Plaintiff's substance-abuse related impairments and limitations from other limitations. [Doc. 19-1, at 18-19.]  When a claimant suffers from a substance-abuse problem, the ALJ must first determine whether the claimant would be disabled using the regular rules.  20 C.F.R. § 404.1535(a) & § 416.935(a); Parra v. Astrue, 481 F.3d 742, 950 (9th Cir. 2007).  The ALJ must then determine whether the claimant would still be disabled if they stopped using drugs or alcohol.  Id.  If not, then the claimant is not eligible for benefits.  Id. (citing Bustamante v. Massanari, 262 F3d 949, 954 (9th Cir. 2001).)  However, where the effects of a mental illness cannot be separated from the effects of substance abuse, then the abuse is not a contributing factor to the disability determination.  Parra, 481 F.3d at 950.  And, the fact that abuse aggravates a mental disorder does not automatically mean that the claimant is not disabled such as where, for example, bipolar disorder may precipitate alcohol abuse.  Id.  If the mental disorder is secondary to the abuse, then a finding of not disabled is supported. Id.  Finally, the claimant has the burden to show that abuse is not a contributing factor.  Id.

The ALJ determined that Plaintiff was not disabled under the regular rules.  Therefore, a differentiating analysis to determine whether he would still be disabled without the effects of his alcoholism was unnecessary.  Bustamante, 262 F.3d at 954 ("If the ALJ finds that the claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits and there is no need to proceed with the [differentiating analysis].")  Nonetheless, the ALJ examined this issue when questioning the ME.  [A.R. 41-43.]  As to the effects of Plaintiff's mental disorders, the ME testified that Plaintiff's depression would be controlled if Plaintiff were to maintain sobriety and comply with prescribed medication.  [A.R. 41.]  He also testified that Plaintiff's inter-personal difficulties would improve with medication and that Plaintiff could eventually work.  [A.R. 41.]  The ALJ then asked the ME whether Plaintiff's alcohol abuse was a major contributing cause during 2007, to which the ME responded "he probably gets along ok until he drinks and then it brings out all his major issues so it is a contributing cause . . in that it brings out his underlying mood disorder."  [A.R. 42.]  Finally, the ME testified that he agreed Plaintiff had the capacity to maintain simple, repetitive work with limited public contact if Plaintiff maintained sobriety.  [A.R. 43.]  The ME's testimony was consistent with the record as a whole and Plaintiff has not met his burden to show that his alcohol abuse is not

1    a contributing factor to his other limitations.

2

3        D.    The ALJ Properly Found That Plaintiff Could Perform Other Work

4            Plaintiff next argues that the ALJ's decision did not establish that Plaintiff could perform other

5    work because he improperly relied on the VE's testimony that Plaintiff could perform other work in

6    the economy.  Plaintiff states that the ALJ failed to identify the Dictionary of Occupational Titles

7    ("DOT") code numbers for other work identified by the VE.  [Doc. 19-1, at 20.]  This assertion is

8    simply false; the VE named codes for the other work she listed.  [A.R. 45.]  Plaintiff also argues the

9    ALJ failed to elicit testimony from the VE as to the specific job descriptions of the jobs cited, and

10   thereby failed to ascertain whether Plaintiff had the physical and mental capacity to perform specific

11   jobs and failed to obtain VE input that her testimony was consistent with the DOT.  [Doc. 19-1, at 20-

12   23.]  Plaintiff cites Hall v. Secretary, to support this contention, 602 F.2d 1372, 1377 (9th Cir. 1979).

13   As with much of Plaintiff's other authority, he has either neglected to read the case or simply would

14   have this Court accept his selective and out of context quote mining as support for the opposite of the

15   case holding.  In Hall, the court remanded because the ALJ made a "general statement" that the

16   claimant could perform other work without the testimony of a VE and without other reliable evidence

17   of the claimant's ability to engage in other occupations.  Id.  The court went on to explain that the

18   better method for supporting this finding is through the testimony of a VE - precisely what the ALJ

19   did during Plaintiff's hearing.  [A.R. 44-45.]

20           Plaintiff does correctly note that SSR 00-4p indicates the ALJ must inquire on the record as

21   to whether there is consistency between the VE's testimony is consistent with the occupational

22   information supplied by the DOT as part of the ALJ's duty to fully develop the record.  However,

23   because there is not a conflict between the VE's testimony and the DOT descriptions listed,[8] any error

24   in this regard is harmless.  The VE was instructed to take into account all of the physical and mental

25   limitations the ALJ found credible and, subject to that instruction, supplied other work that Plaintiff

26

27   _____

28       [8]  DOT Nos. 706.684.022 and 789.687.066 both indicate light repetitive work, vocational
     preparation of up to a month, and no significant interactions with others.

had the capacity to perform.  None of Plaintiff's other authority supports a finding that the ALJ improperly relied on the VE's testimony; we do not find error on this ground.

        E.        <u>The ALJ Provided a Valid Opinion of Plaintiff's Residual Functional Capacity</u>

Plaintiff argues that the ALJ failed to provide a valid assessment of his residual functional capacity because the ALJ did not articulate a function-by-function assessment of Plaintiff's limitations and restrictions.  [Doc. 19-1, at 24.]  Social Security Ruling 96-8p states that the RFC assessment is a function-by-function assessment based on all relevant evidence of an individual's ability to do work related activities.  SSR 96-8p.  At step four of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" because the first consideration is whether the individual can to past relevant work as he actually performed it; and this determination requires a function-by function assessment.  <u>Id.</u> The RFC should then be expressed in exertional categories at step five.  <u>Id.</u>  The RFC assessment must be based solely on the individual's impairments, therefore the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments.  <u>Id.</u>  It is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairments including any related symptoms, such as pain.  <u>Id.</u>

There are exertional and nonexertional functions.  <u>Id.</u>  Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's ability to sit, stand, walk, lift, carry, push, and pull.  <u>Id.</u>  Nonexertional capacity considers all work-related limitations that do not depend on physical strength and assesses postural, manipulative, visual, communicative, and mental capacities.  <u>Id.</u>  The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts such as laboratory findings and non-medical evidence such as daily activities.  <u>Id</u>  It must also include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.  <u>Id.</u>  The psychiatric review technique, summarized on the Psychiatric Review Technique Form ("PTRF") requires adjudicators to assess an

individual's limitations and restrictions from mental impairments in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  Id.

Plaintiff again selectively mined a helpful quote from the above described Ruling.  However, taken as a whole, the ruling supports the ALJ's decision.  The ALJ properly reviewed all of the relevant evidence in this case.  He gave extensive reasons that comport with the requirements of the Ruling. [A.R. 14-16.] The ALJ considered Plaintiff's daily activities, medical records, pain allegations, and compliance with treatment and determined that they did not support the degree of limitation alleged by Plaintiff.  [A.R. 14-16.]  The Ruling does not require the ALJ to incorporate discredited symptoms in his assessment of Plaintiff's RFC.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  As to Plaintiff's mental limitations and restrictions, the ALJ wrote, "the claimant has mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and has had one documented episode of decompensation of extended duration."  [A.R. 14.]  Accordingly, the ALJ's RFC assessment was not based on legal error and is supported by substantial evidence in the record and we do not find remand on this ground appropriate.

**VII.   CONCLUSION**

As a final note, Plaintiff presses that because of numerous other time delays in this case, this Court should reverse and award benefits.  The time delays have been the sole result of Plaintiff's failure to effect timely service and failure to respond in a timely fashion to this Court's resulting Order to Show Cause why the case should not be dismissed.  Ultimately, Plaintiff did not serve a copy of the summons and complaint on Defendant until more than a year after he filed his complaint.  Plaintiff's assertions about dire financial need and about general time delays do not constitute legal reasons to award benefits.

For the reasons set forth above, the Court recommends DENYING Plaintiff's Motion for Summary Judgment and GRANTING Defendant's Motion for Summary Judgment.

This Report and Recommendation is submitted to the Honorable Roger T. Benitez, the United States District Judge assigned to the case, pursuant to 28 U.S.C. § 636(b)(1).  Any party may file

written objections with the Court and serve a copy on all parties on or before <u>May 4, 2012</u>.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be served and filed on or before <u>May 11, 2012</u>.  The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: <u>April 13, 2012</u>

Peter C. Lewis
U.S. Magistrate Judge
United States District Court

- 30 -

10cv1167